UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------- X

RONALD BLACKWELL,                                    :

                              Plaintiff,             :     Case No.: _____

                                                     :
        -against-                                    :     **COMPLAINT**
                                                     :
                                                     :     **DEMAND FOR JURY TRIAL**
FORESCOUT TECHNOLOGIES INC.,                          :
MICHAEL DECESARE, THERESIA GOUW,                      :
JAMES BEER, DAVID DEWALT,                             :
ELIZABETH HACKENSON, MARK                             :
JENSEN, KATHY MCELLIGOTT, ENRIQUE                     :
SALEM, and HEZY YESHURUN,                             :
                                                     :
                              Defendants.            :

---------------------------------------- X

Plaintiff, Ronald Blackwell ("Plaintiff"), by his undersigned attorneys, alleges upon

personal knowledge with respect to himself, and information and belief based upon, *inter alia*, the

investigation of counsel as to all other allegations herein, as follows:

## NATURE OF THE ACTION

1.      This is an action brought by Plaintiff against Forescout Technologies, Inc.

("Forescout" or the "Company") and the members of the Company's board of directors

(collectively referred to as the "Board" or the "Individual Defendants" and, together with

Forescout, the "Defendants") for their violations of Sections 14(a) and 20(a) of the Securities

Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78n(a), 78t(a) respectively, and United

States Securities and Exchange Commission ("SEC") Rule 14a-9, 17 C.F.R. § 240.14a-9.

Plaintiff's claims arise in connection with the proposed acquisition of Forescout by Ferrari Group

Holdings, L.P. ("Parent"), and Ferrari Merger Sub, Inc. ("Merger Sub"), affiliates of Advent

International Corporation (together with Parent and Merger Sub "Advent").

2.      On February 6, 2020, Forescout announced that Forescout and Advent had entered

into an agreement and plan of merger (the "Merger Agreement"), pursuant to which Forescout would merge with and into Advent (the "Proposed Transaction").

3. Pursuant to the terms of the Merger Agreement, Forescout's shareholders will be entitled to receive $33.00 per share in cash for each share of Forescout common stock they own (the "Merger Consideration").

4. On March 3, 2020, in order to convince Forescout's public common stockholders to vote in favor of the Proposed Transaction, the Defendants authorized the filing of a materially incomplete and misleading Schedule 14(a) Preliminary Proxy Statement (the "Proxy") with the Securities and Exchange Commission ("SEC").

5. In particular, the Proxy contains materially incomplete and misleading information concerning the background of the Proposed Transaction and the valuation analyses performed by Forescout's financial advisors, Morgan Stanley & Co. LLC ("Morgan Stanley" or the "Financial Advisors") regarding the Proposed Transaction.

6. The Proposed Transaction is expected to close in the second quarter of 2020 and the special meeting of the Company's shareholders to vote on the Proposed Transaction will be scheduled in the coming weeks.  Therefore, it is imperative that the material information that has been omitted from the Proxy is disclosed prior to the special meeting, so Plaintiff can properly exercise his corporate voting rights.

7. For these reasons, and as set forth in detail herein, Plaintiff asserts claims against Defendants for violations of Sections 14(a) and 20(a) of the Exchange Act and Rule 14a-9. Plaintiff seeks to enjoin Defendants from taking any steps to consummate the Proposed Transaction unless and until the material information discussed below is disclosed to Forescout's public common shareholders sufficiently in advance of the upcoming shareholder vote or, in the

event the Proposed Transaction is consummated, to recover damages resulting from the Defendants' violations of the Exchange Act.

## JURISDICTION AND VENUE

8.     This Court has jurisdiction over all claims asserted herein pursuant to Section 27 of the 1934 Act because the claims asserted herein arise under Sections 14(a) and 20(a) of the 1934 Act and Rule 14a-9.

9.     Personal jurisdiction exists over each Defendant either because the Defendant conducts business in or maintains operations in this District, or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over each Defendant by this Court permissible under the traditional notions of fair play and substantial justice. "Where a federal statute such as Section 27 of the [Exchange] Act confers nationwide service of process, the question becomes whether the party has sufficient contacts with the United States, not any particular state." *Sec. Inv'r Prot. Corp. v. Vigman*, 764 F.2d 1309, 1315 (9th Cir. 1985). "[S]o long as a defendant has minimum contacts with the United States, Section 27 of the Act confers personal jurisdiction over the defendant in any federal district court." *Id.* at 1316.

10.     Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, as well as 28 U.S.C. § 1391, because Defendants are found or are inhabitants or transact business in this District. Indeed, Forescout's common stock trades on the Nasdaq Stock Market ("Nasdaq"), which is headquartered in this District. *See, e.g., United States v. Svoboda*, 347 F.3d 471, 484 n.13 (2d Cir. 2003) (collecting cases).

//

//

3

## PARTIES

11.     Plaintiff is, and has been continuously throughout all times relevant hereto, the owner of Forescout common stock.

12.     Defendant Forescout is a Delaware corporation with its principal executive offices located at 190 West Tasman Drive, San Jose, California 95134.

13.     Defendant Michael DeCesare ("DeCesare") is, and has been at all relevant times, the Company's President and Chief Executive Officer and a director of the Company.

14.     Defendant Theresia Gouw ("Gouw") is, and has been at all relevant times, the Chair of the Company's Board of Directors.

15.     Defendant James Beer ("Beer") is, and has been at all relevant times, a director of the Company.

16.     Defendant David DeWalt ("DeWalt") is, and has been at all relevant times, a director of the Company.

17.     Defendant Elizabeth Hackenson ("Hackenson") is, and has been at all relevant times, a director of the Company.

18.     Defendant Mark Jensen ("Jensen") is, and has been at all relevant times, a director of the Company.

19.     Defendant Kathy McElligott ("McElligott") is, and has been at all relevant times, a director of the Company.

20.     Defendant Enrique Salem ("Salem") is, and has been at all relevant times, a director of the Company.

21.     Defendant Hezy Yeshurun ("Yeshurun") is a co-founder of the Company and the former Chair of Company's Board of Directors, and has been at all relevant times, a director of

the Company.

22.     The Defendants identified in paragraphs 13 through 21 are collectively referred to herein as the "Board" or the "Individual Defendants," and together with the Company, the "Defendants."

## SUBSTANTIVE ALLEGATIONS

**Background of the Company and the Proposed Transaction**

23.     Forescout is a publicly traded Delaware corporation that provides security services to enterprises and government agencies across a wide range of markets, including the financial services, government and defense, healthcare, manufacturing, education, retail, and critical infrastructure markets.  The Company's common stock trades on the Nasdaq under the ticker symbol "FSCT."

24.     Prior to the announcement of the Proposed Transaction, Forescout had excellent growth prospects.  For example, American Security Today recently selected Forescout as a "Platinum Award Winner" in its 2019 Homeland Security Awards, noting:

> The Forescout platform provides complete situational awareness and device visibility which enables an accurate device inventory, continuous compliance enforcement, policy-based access control, the ability to orchestrate actions to reduce cyber risk and rapid response to security incidents.

25.     However, Forescout was negotiating the Proposed Transaction during a period of temporary weakness.  Indeed, on October 10, 2019, Forescout issued a press release entitled *Forescout Technologies Announces Preliminary Third Quarter 2019 Financial Results*, which announced that the Company "disappointed that our third quarter results were below our guidance" but explained that, although those disappointing results "were impacted by extended approval cycles which pushed several deals out of the third quarter," those "deals were not lost to competitors" and Forescout's "fundamentals of our business remain strong," as "reflected in our

pipeline, which continued to grow, and in a number of positive trends that we saw in the third quarter."

26.     In fact, the Proxy makes clear that (i) Forescout's strategic review process flowed directly from the Board's perception of stockholder activism in light of the announcement of the Corvex/Jericho Group following Forescout's release of its fiscal 2019 preliminary third quarter results, and (ii) Forescout's Strategic Committee rushed the acquisition process to ensure that it could execute a definitive merger agreement before announcing its fiscal 2019 fourth quarter results.

27.     Thus, the Proposed Transaction comes at a time of temporary weakness, when Forescout's future success was not properly reflected by its share price.  As a result, the Proposed Transaction will "compensate" Forescout's stockholders with cash that fails to adequately compensate them for the intrinsic value of their shares.

28.     Despite Forescout's intrinsic value and growth prospects, the Individual Defendants are agreeing to a merger that cashes out the Company's stockholders and deprives them the ability to partake in Forescout's growth.  The Individual Defendants breached their fiduciary duties owed to the Company's stockholders by agreeing to the Proposed Transaction for the unfair Merger Consideration, and by allowing the unfair and flawed sales process to unfold in the manner that it did, which will cause Plaintiff and the Class to receive an inadequate Merger Consideration.

**The Proposed Transaction**

29.     On February 6, 2020, Forescout issued a press release announcing the Proposed Transaction, which stated in part:

//

6

**Forescout to be Acquired by Advent International in $1.9 Billion Transaction**

- *Forescout Shareholders to Receive $33.00 per Share in Cash*

- *Advent will be joined by Crosspoint Capital Partners; combined team will be led by experienced cybersecurity software investors and executives Bryan Taylor and Greg Clark*

- *Advent and Crosspoint Capital will help Forescout build on its success in the device visibility and control market and further its leadership in IoT cybersecurity*

SAN JOSE, Calif., Feb. 06, 2020 (GLOBE NEWSWIRE) -- Forescout Technologies, Inc. (NASDAQ:FSCT, "Forescout"), the leader in device visibility and control, today announced that it has entered into a definitive agreement under which Advent International ("Advent"), one of the largest and most experienced global private equity investors, will acquire all outstanding shares of Forescout common stock for $33.00 per share in an all-cash transaction valued at $1.9 billion. Advent will be joined by Crosspoint Capital Partners ("Crosspoint Capital"), a private equity investment firm focused on the cybersecurity and privacy industries, as a co-investor and advisor.

The purchase price represents a premium of approximately 30% over Forescout's closing share price of $25.45 on October 18, 2019, the last full trading day prior to the release of the 13-D filings by Corvex Management L.P. and Jericho Capital Asset Management L.P. on October 21, 2019, which disclosed they had formed a partnership to approach Forescout and accumulated a combined 14.5% ownership in the company. Upon completion of the transaction, Forescout will become a private company with the flexibility to continue investing in the development and deployment of leading-edge cybersecurity products and solutions that serve the evolving needs of enterprise customers. CEO and President Michael DeCesare will continue to lead the company, and Forescout will continue to be headquartered in San Jose, California.

"Forescout has established itself as a leader in device visibility and control, with the most advanced platform in the market," said Michael DeCesare, CEO and President, Forescout. "We are still in early innings of a large market opportunity as every organization needs visibility into what is connecting to their network and how to mitigate against high risk devices, including non-traditional IoT and OT devices. This transaction represents an exciting new phase in the evolution of Forescout. We are excited to be partnering with Advent International and Crosspoint Capital, premier firms with security DNA and track records of success in strengthening companies and supporting them through transitionary times. We look forward to working with Advent and Crosspoint Capital to advance our strategic objectives and want to thank our employees for their continued hard work and commitment to Forescout."

"We are pleased to have reached this agreement with Advent, which delivers significant immediate value to shareholders, and positions Forescout to continue meeting and exceeding the expectations of our customers," said Theresia Gouw, Chair of the Forescout Board. "This transaction, which is the result of a robust process conducted by the Board of Directors with the assistance of independent legal and financial advisors, is a testament to the value Forescout has created and the reputation our team has built. In making its determination, the Board of Directors considered the likely volatility associated with the business model transition to ratable revenue recognition, changes to our go-to-market initiatives, particularly in EMEA, and timing of significant eight-figure deals, while managing to quarterly street estimates as a publicly traded company. We are confident that this transaction is the best path forward for Forescout and our stakeholders."

"Forescout is an ideal partner for Advent — as it's a mission-critical business positioned to capitalize on key tech megatrends," said Bryan Taylor, head of Advent's technology investment team and a Managing Partner in Palo Alto. "The company has differentiated itself from its core competitors with its proprietary, agentless technology, making it ideal for large, complex organizations in a rapidly evolving cyber risk landscape. In partnership with Greg Clark and the Crosspoint Capital team, Advent is thrilled to work with Forescout to build on its record of innovation and continue delivering world-class cybersecurity solutions to customers for years to come."

"As enterprises continue to shift to the cloud and decentralized networks, today's chief information security officers are looking for secure solutions to increase visibility and provide orchestration, making their network controls more seamless," said Greg Clark, Managing Partner at Crosspoint Capital. "Forescout's platform is already ahead of the curve, and we believe we can further advance the company's market position by applying the collective experience and expertise in cybersecurity software of the Advent and Crosspoint Capital team."

**Transaction Details**

Under the terms of the agreement, which has been unanimously approved by the Forescout Board of Directors, Forescout shareholders will receive $33.00 in cash for each share of common stock they own.

The agreement includes a 30-day "go-shop" period expiring on March 8, 2020, which permits Forescout's Board of Directors and advisors to solicit alternative acquisition proposals from third parties. Forescout will have the right to terminate the merger agreement to enter into a superior proposal subject to the terms and conditions of the merger agreement. There can be no assurance that this "go-shop" will result in a superior proposal, and Forescout does not intend to disclose developments with respect to the solicitation process unless and until it determines such disclosure is appropriate or is otherwise required.

The transaction is expected to close in the second calendar quarter of 2020, subject to customary closing conditions, including approval by Forescout shareholders and receipt of regulatory approvals. Upon completion of the transaction, Forescout common stock will no longer be listed on any public market.

**Fourth Quarter and Full Year 2019 Conference Call Update**

Separately, Forescout today announced its fourth quarter and full year 2019 financial results, which are available on the "Investor Relations" section of the Forescout website. In light of the announced transaction with Advent International, Forescout has cancelled the earnings conference call previously scheduled for February 6, 2020, at 1:30pm PT (4:30pm ET).

**Advisors**

Morgan Stanley & Co. LLC is serving as exclusive financial advisor to Forescout and Wilson Sonsini Goodrich & Rosati is serving as legal counsel. Ropes & Gray is serving as legal counsel to Advent International and financing for the transaction is being arranged and provided by Owl Rock Capital.

**The Preclusive Deal Protection Devices**

30.     To the detriment of the Company's shareholders, the Individual Defendants agreed, in the Merger Agreement, to certain onerous and preclusive deal protection devices that operate conjunctively to make the Proposed Transaction a *fait accompli* and all but ensure that the Proposed Transaction is consummated and that no competing offers emerge for the Company.

31.     The Merger Agreement is protected by "no-shop" provisions that prohibit the Individual Defendants from engaging in discussions or negotiations relating to proposals regarding alternative acquisitions or business combinations outside of a brief "go-shop" period.

32.     The Merger Agreement also requires the Board to provide Advent with written notice of any Acquisition Proposal and further requires the Board to provide prior written notice of its intention to terminate the Merger Agreement in favor of any Superior Proposal and negotiate with Advent following Advent's receipt of the notice, so that Advent has the opportunity to adjust the terms and conditions of the Merger Agreement so that the Acquisition Proposal ceases to be a

Superior Proposal.

33.     In addition, the Merger Agreement provides that the Company will be required to pay a termination fee of more than $37,000,000.00 with respect to any termination under the go-shop provision and $56,000,000.00 with respect to any termination under the no-shop provision.

34.     Ultimately, these preclusive deal protection devices restrained and continue to restrain the Company's ability to solicit or engage in negotiations with any third party regarding a proposal to acquire all or a significant interest in the Company.  The aggregate effect of these preclusive deal protection devices, viewed in light of the materially inadequate consideration offered for the Company's shares in the Proposed Transaction and the flawed and conflicted negotiations process, supports an inference that the Board was not acting in good faith in approving the terms of the Merger Agreement.

35.     Accordingly, Plaintiff seeks injunctive and other equitable relief to prevent the irreparable injury that the Company's shareholders will continue to suffer absent judicial intervention.

**The Proxy Omits Material Information**

36.     On or about March 3, 2020, in order to convince Forescout's public common shareholders to vote in favor of the Proposed Transaction, the Defendants authorized the filing of the materially incomplete and misleading Proxy with the SEC, in violation of Sections 14(a) and 20(a) of the Exchange Act.

37.     Specifically, the Proxy omits two types of material information: (i) information regarding the background of the Proposed Transaction that implicate the Individual Defendants' conflicts of interests; and (ii) projections and other financial information that renders the Financial Advisors' fairness analysis materially false, misleading, or incomplete.

A.      **The Proxy Omits Material Information Regarding the Background of the Proposed Transaction**

38.      The Proxy fails to provide material information regarding the background of the merger that implicate the possibility that the Merger Consideration is inadequate.

39.      Page 39 of the Proxy states that Defendant Salem "recused himself from the portions of any meetings of the Strategic Committee or the Forescout Board at which discussions concerning an acquisition of Forescout occurred" because Defendant Salem disclosed that he had a business relationship with one of the potential counterparties that expressed interest in acquiring Forescout but fails to disclose (i) whether the Board and/or the Strategic Committee discussed removing him from, or replacing him on, the Strategic Committee following his disclosure that he would need to recuse himself from any discussions concerning an acquisition of Forescout, and if so, (ii) why it did not do so.

40.      Page 40 of the Proxy states that the ten potential acquirers "entered into, or were already party to, confidentiality agreements with Forescout," which "do not prohibit the counterparty from making non-public acquisition proposals to Forescout" but does not disclose (i) whether those confidentiality agreements prohibited the potential counterparty from making public acquisition or hostile takeover proposals, and if so, (ii) whether those standstill agreements were subject to "Don't Ask, Don't Waive" ("DADW") provisions and continue to remain in place following Forescout's public announcement of the Proposed Transaction, or were subject to fall-away provisions that terminated each potential counterparty's public standstill obligations upon the announcement of the Proposed Transaction.  This information is especially material in light of the Proxy's disclosure that Strategic B (i) was expressing, as of December 10, 2019, "the strongest level of interest in pursuing an acquisition of Forescout," but (ii) was not prepared to further explore such an acquisition "until after Forescout publicly announced its results for the fourth

quarter of 2019," which (iii) the Strategic Committee resolved to announce concurrently with "any sale of Forescout."

41.     Pages 45-46 of the Proxy state that, immediately prior to the Board executing the Merger Agreement with Advent "representatives of Morgan Stanley provided the Forescout Board with customary disclosures regarding its relationships with Advent and its affiliates," but the Proxy fails to disclose whether this was the first time that Morgan Stanley disclosed these relationships to the Board and the Strategic Committee.   Page 59 of the Proxy states that Morgan Stanley and its affiliates had received "approximately $30.0 million to $50.0 million in fees in connection with such services."   When Morgan Stanley first disclosed that it had received "approximately 30.0 million to $50.0 million in fees" from Advent during the two-year period leading up to the Proposed Transaction is material to shareholders because the failure to disclose when Morgan Stanley first disclosed these relationships implicates the possibility that the Board did not know that Morgan Stanley may have had dual loyalties while it was negotiating the Proposed Transaction and preparing its fairness opinion until after the execution of the Merger Agreement was *fait accompli*.

42.     Page 46 of the Proxy discloses that the Strategic Committee instructed Morgan Stanley to contact seven additional potential strategic acquirers and four additional financial acquirers concerning an acquisition of Forescout on February 12, 2020 but fails to disclose why the Strategic Committee did not instruct Morgan Stanley to contact these parties until after it had already executed the Merger Agreement with Advent.   The facts underpinning Forescout's determination that it should expand the scope of its outreach *after* executing the Merger Agreement are especially material to Forescout's public shareholders in light of the possibility that Morgan Stanley did not disclose its relationships with Advent until the Merger Agreement had already

been negotiated.

**B.**     **The Proxy Omits Material Projections and other Financial Information that Renders the Company's Financial Advisors' Fairness Analysis Materially Misleading**

43.     The Proxy also omits material information that renders the Financial Advisors' Fairness Analysis materially misleading.

44.     The Proxy describes the Fairness Opinion and the various valuation analyses that the Financial Advisors performed to render its opinion but fails to provide enough information regarding the necessary data, support for conclusions, or the existence of, or basis for, the underlying assumptions that underpin the fairness opinion.   Specifically, the Proxy does not disclose enough information regarding the financial projections, inputs, and assumptions for various financial valuations.   Without this information, stockholders cannot replicate the analyses, confirm the valuations, evaluate the Financial Advisors' opinion that the Merger Consideration is fair, or accurately assess the reliability of the Fairness Opinion.   The informative value of the Fairness Opinion is not in its conclusions, but in the valuation analyses that support them.   Thus, the key inputs, which are intrinsically baked into those conclusions, must also be fairly disclosed.

45.     With respect to both the Target Plan and the Alternate Plan, the Proxy omits critical financial projections, including the net income projections (the "Net Income Projections"). Defendants elected to summarize the projections for Forescout in the Proxy, but they excised and failed to disclose the Net Income Projections. By providing this limited summary in the Proxy and withholding the Net Income Projections, Defendants render the tables of projections on pages 62-63 of the Proxy materially incomplete and provide a misleading valuation picture of Forescout. Simply put, net income projections are irreplaceable when it comes to fully, fairly, and properly understanding a company's projections and value.

46.     With respect to Morgan Stanley's *Public Trading Comparables Analysis* beginning on Page 52, the Proxy fails to disclose (i) all of the objective criteria that Morgan Stanley relied on in selecting the purportedly comparable companies, (ii) Morgan Stanley's full rationale and basis for its selected multiple ranges, and (iii) Morgan Stanley's full rational and basis for basing its valuation on Estimated 2020 Revenue and Estimated 2021 Revenue rather than Estimated 2020 EBITDA and Estimated 2022 EBITDA.

47.     With respect to Morgan Stanley's *Discounted Equity Value Analysis* beginning on Page 54, the Proxy fails to: (i) fully disclose Morgan Stanley's rationale and basis for selecting the implied Aggregate Value to 2023 Estimated Revenue Multiple Ranges of 4.0x to 6.0x for the Target Plan, and 3.5x to 5.5x for the Alternate Plan, (ii) fully disclose Morgan Stanley's rationale and basis for selecting a discount rate of 10.8%, and (iii) provide a sensitivity table that presents the derived enterprise values across the full range of discount rates and EBITDA exit multiples.

48.     With respect to Morgan Stanley's *Discounted Cash Flow Analysis* ("DCF") beginning on Page 55, the Proxy fails to: (i) fully disclose Morgan Stanley's rationale and basis for selecting discount rate ranges from 9.8% to 11.8%, (ii) fully disclose Morgan Stanley's rationale and basis for applying a range perpetuity growth rates of 2.5% to 3.5%, and (iii) provide a sensitivity table that presents the derived enterprise values across the full range of discount rates and perpetuity growth rates.

49.     This information is material to the Company's shareholders, and the omission of this information renders the summary of the *Discounted Cash Flow Analysis* incomplete and misleading.  As one highly-respected law professor explained regarding these crucial inputs, in a discounted cash flow analysis a banker takes management's forecasts, and then makes several key choices "each of which can significantly affect the final valuation."  Steven M. Davidoff, Fairness

Opinions, 55 Am. U.L. Rev. 1557, 1576 (2006).  Such choices include "the appropriate discount

rate, and the terminal value…"  *Id.*  As Professor Davidoff explains:

> There is substantial leeway to determine each of these, and any change can
> markedly affect the discounted cash flow value.  For example, a change in the
> discount rate by one percent on a stream of cash flows in the billions of dollars can
> change the discounted cash flow value by tens if not hundreds of millions of
> dollars….This issue arises not only with a discounted cash flow analysis, but with
> each of the other valuation techniques.  *This dazzling variability makes it difficult
> to rely, compare, or analyze the valuations underlying a fairness opinion **unless
> full disclosure is made of the various inputs in the valuation process, the weight
> assigned for each, and the rationale underlying these choices**. The substantial
> discretion and lack of guidelines and standards also makes the process vulnerable
> to manipulation to arrive at the "right" answer for fairness.  This raises a further
> dilemma in light of the conflicted nature of the investment banks who often provide
> these opinions.

*Id.* at 1577-78 (emphasis added).  Without the above-mentioned information, the Company's

shareholders cannot: (i) evaluate for themselves the reliability of the *Discounted Cash Flow

Analysis*, (ii) make a meaningful determination of whether the implied equity value ranges

properly value the Company or were the result of an unreasonable judgment by the Financial

Advisors, or (iii) make an informed decision regarding whether to vote in favor of the Proposed

Transaction.

50.     With respect to Morgan Stanley's *Selected Precedent Transactions Analysis*

beginning on Page 55, the Proxy fails to disclose, with respect to each precedent transaction, (i)

whether the transaction contemplated stock consideration or cash consideration, (ii) whether the

acquiror was a strategic acquiror or a financial acquiror, and (iii) Morgan Stanley's full rationale

and basis for its selected range of multiples, including why Morgan Stanley selected a different

range of multiples with respect to its valuation based on the Target Plan as opposed to its

valuation based on the Alternate Plan and Illustrative Guidance.

51.     With respect to Morgan Stanley's *Precedent Premiums* analysis beginning on

Page 57, the Proxy fails to disclose whether any of the precedent transactions also had disturbances to the acquired company's stock price occur prior to the announcement of the transaction. This information is material to shareholders because it factors directly on whether the stated valuation range based on the Premia to 1-Day Closing Share Price provides a more accurate benchmark on which to value Forescout than the stated valuation range based on the Premia to 1-Day Unaffected Share Price.

52.    The Proxy fails to fully disclose material information regarding Morgan Stanley's prior relationships with Advent. On Page 59, the Proxy states that Morgan Stanley has received "approximately $30.0 million to $50.0 million in fees in connection with" advisory and financing services for Advent and its affiliates but fails to disclose (i) when these relationships were disclosed to the Strategic Committee and the Forescout Board, and (ii) the actual amount of fees that Morgan Stanley received from Advent.

53.    If a Proxy discloses financial projections and valuation information, such projections and valuations must be complete, accurate, and honest. The question is not simply whether there is a duty to speak, but also whether there may be liability for not having spoken enough. With regard to future events, uncertain figures, and other so-called soft information, a company may choose silence or speech elaborated by the factual basis as then known—but it may not choose half-truths. *See Campbell v. Transgenomic, et al.*, No. 18-2198 (8th Cir., March 1, 2019) (noting that "half-truths" are actionable misrepresentations under securities laws and collecting cases). Accordingly, Defendants have disclosed some of the information related to the projections, assumptions, and inputs relied upon by Defendants' financial advisors, but have omitted crucial line items, reconciliations, and other information. Thus, Defendants' omission renders the projections disclosed in the Proxy misleading.

54.     In sum, the omission of the above-referenced information renders the Proxy materially incomplete and misleading, in contravention of the Exchange Act.   Absent disclosure of the foregoing material information prior to the upcoming shareholder vote concerning the Proposed Transaction, Plaintiff will be unable to make an informed decision regarding whether to vote his shares in favor of the Proposed Transaction, and he is thus threatened with irreparable harm, warranting the injunctive relief sought herein.

**COUNT I**

**(Against All Defendants for Violations of Section 14(a) of the Exchange Act and Rule 14a-9)**

55.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

56.     Section 14(a)(1) of the Exchange Act makes it "unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 78l of this title."  15 U.S.C. § 78n(a)(1).

57.     Rule 14a-9, promulgated by the SEC pursuant to Section 14(a) of the Exchange Act, provides that proxy communications shall not contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading."  17 C.F.R. § 240.14a-9.

58.     The omission of information from a proxy will violate Section 14(a) and Rule 14a-

17

9 if other SEC regulations specifically require disclosure of the omitted information.

59.     Defendants have issued the Proxy with the intention of soliciting the Company's common shareholders' support for the Proposed Transaction.  Each of the Individual Defendants reviewed and authorized the dissemination of the Proxy, which fails to provide critical information regarding the valuation analyses performed by the Company's Financial Advisors in support of its fairness opinion.

60.     In so doing, Defendants made untrue statements of fact and/or omitted material facts necessary to make the statements made not misleading.  Each of the Individual Defendants, by virtue of their roles as officers and/or directors, were aware of the omitted information but failed to disclose such information, in violation of Section 14(a).  The Individual Defendants were therefore negligent, as they had reasonable grounds to believe material facts existed that were misstated or omitted from the Proxy, but nonetheless failed to obtain and disclose such information to the Company's shareholders although they could have done so without extraordinary effort.

61.     The Individual Defendants knew or were negligent in not knowing that the Proxy is materially misleading and omits material facts that are necessary to render it not misleading. The Individual Defendants undoubtedly reviewed and relied upon most if not all of the omitted information identified above in connection with their decision to approve and recommend the Proposed Transaction; indeed, the Proxy states that the Company's Financial Advisors reviewed and discussed its financial analyses with the Board, and further states that the Board considered the financial analyses provided by the Company's Financial Advisors, as well as its fairness opinion and the assumptions made and matters considered in connection therewith.  Further, the Individual Defendants were privy to and had knowledge of the projections for the Company and the details surrounding the process leading up to the signing of the Merger Agreement.  The

Individual Defendants knew or were negligent in not knowing that the material information identified above has been omitted from the Proxy, rendering the sections of the Proxy identified above to be materially incomplete and misleading.  Indeed, the Individual Defendants were required to, separately, review the Company's Financial Advisors' analyses in connection with their receipt of the fairness opinions, question the Company's Financial Advisors as to its derivation of fairness, and be particularly attentive to the procedures followed in preparing the Proxy and review it carefully before it was disseminated, to corroborate that there are no material misstatements or omissions.

62.    The Individual Defendants were, at the very least, negligent in preparing and reviewing the Proxy.  The preparation of a proxy statement by corporate insiders containing materially false or misleading statements or omitting a material fact constitutes negligence.  The Individual Defendants were negligent in choosing to omit material information from the Proxy or failing to notice the material omissions in the Proxy upon reviewing it, which they were required to do carefully as the Company's directors.  Indeed, the Individual Defendants were intricately involved in the process leading up to the signing of the Merger Agreement and preparation and review of the Company's financial projections.

63.    The Company is also deemed negligent as a result of the Individual Defendants' negligence in preparing and reviewing the Proxy.

64.    The misrepresentations and omissions in the Proxy are material to Plaintiff, who will be deprived of his right to cast an informed vote if such misrepresentations and omissions are not corrected prior to the Shareholder Vote.  Plaintiff has no adequate remedy at law.  Only through the exercise of this Court's equitable powers can Plaintiff be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## COUNT II

**(Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act)**

65.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

66.     The Individual Defendants acted as controlling persons of the Company within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their positions as officers and/or directors of the Company, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the incomplete and misleading statements contained in the Proxy filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that Plaintiff contends are materially incomplete and misleading.

67.     Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

68.     In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the Exchange Act violations alleged herein, and exercised the same.   The Proxy contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed Transaction.  They were thus directly involved in preparing this document.

69.     In addition, as the Proxy sets forth at length, and as described herein, the Individual

Defendants were involved in negotiating, reviewing, and approving the Proposed Transaction. The Proxy purports to describe the various issues and information that the Individual Defendants reviewed and considered. The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

70.     By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

71.     As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and Rule 14a-9 by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, these Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Individual Defendants' conduct, Plaintiff will be irreparably harmed.

72.     Plaintiff has no adequate remedy at law. Only through the exercise of this Court's equitable powers can Plaintiff be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

<u>**PRAYER FOR RELIEF**</u>

**WHEREFORE**, Plaintiff prays for judgment and relief as follows:

A.     Preliminarily enjoining Defendants and all persons acting in concert with them from proceeding with the Shareholder Vote or consummating the Proposed Transaction until the Company discloses the material information discussed above which was omitted from the Proxy;

B.     Directing the Defendants to account to Plaintiff for all damages sustained as a result of their wrongdoing;

C.     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and expert fees and expenses; and

D.      Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.


Dated: March 13, 2020                          **MONTEVERDE & ASSOCIATES PC**

                                By:   _/s/ Juan E. Monteverde_____
                                      Juan E. Monteverde (JM-8169)
                                      The Empire State Building
                                      350 Fifth Avenue, Suite 4405
                                      New York, NY 10118
                                      Tel:(212) 971-1341
                                      Fax:(212) 202-7880
                                      Email: jmonteverde@monteverdelaw.com

                                      *Attorneys for Plaintiff*

**OF COUNSEL:**

**ADEMI & O'REILLY, LLP**
Guri Ademi
Jesse Fruchter
3620 East Layton Avenue
Cudahy, Wisconsin 53110
Tel: (414) 482-8000
Fax: (414) 482-8001
Email: gademi@ademilaw.com
          jfruchter@ademilaw.com

*Attorneys for Plaintiff*